**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 19-3806

———————

UNITED STATES OF AMERICA

v.

SCOTT ALLINSON,

Appellant

———————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action No. 5-17-cr-00390-002)
District Judge: Honorable Juan R. Sanchez

———————

Submitted Under Third Circuit L.A.R. 34.1(a)
September 28, 2021

Before: AMBRO, KRAUSE, and BIBAS, Circuit Judges

(Opinion filed: March 4, 2022)

Megan S. Scheib
715 Pine Street
Apartment 5
Philadelphia, PA  19106

Counsel for Appellant

Richard P. Barrett
Michelle Morgan
Anthony J. Wzorek
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA  19106

Counsel for Appellee

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

Scott Allinson appeals his convictions of federal programs bribery, 18 U.S.C. § 666(a)(2), and conspiracy, 18 U.S.C. § 371, in connection with a pay-to-play scheme involving Edwin Pawlowski, the former Mayor of Allentown, Pennsylvania.  Allinson's challenges are based on several theories: (1) there was insufficient evidence to support the bribery charge; (2) the Government failed to prove the single conspiracy alleged in the indictment, resulting in a prejudicial

variance from the indictment; (3) it impermissibly amended the bribery charge; (4) it made improper statements during its closing argument; and (5) his trial should have been severed from that of his co-defendant Pawlowski, as Allinson was prejudiced by the numerous charges lodged against the former Mayor.[1]

In thorough and well-reasoned opinions and orders, the District Court rejected Allinson's contentions. We do the same.[2]

## I.

We start with Allinson's sufficiency-of-the-evidence challenge, which we review anew. *United States v. John-Baptiste*, 747 F.3d 186, 201 (3d Cir. 2014). But out of deference to the jury's verdict, we "consider the evidence in the light most favorable to the [G]overnment and affirm the judgment if there is substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt." *Id.* (quoting *United States v. Benjamin*, 711 F.3d 371, 376 (3d Cir. 2013)). We will uphold its decision "as long as it does not 'fall below the threshold of bare rationality.'" *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431 (3d Cir. 2013) (en banc) (quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012)).

---

[1] Pawlowski's appeal is pending before our Court, C.A. No. 18-3390, and is consolidated with this matter for disposition purposes by Clerk's Order entered January 29, 2020. A separate opinion addresses that appeal.

[2] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

The federal programs bribery statute—the basis of Allinson's bribery conviction—makes it a crime to "corruptly give[], offer[], or agree[] to give anything of value to any person, with intent to influence or reward [a government agent] in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more."  18 U.S.C. § 666(a)(2).  The Government's evidence against Allinson consisted of several recorded conversations among himself, Pawlowski, and two of Pawlowski's political consultants, Michael Fleck and Sam Ruchlewicz (both of whom were, unbeknownst to Allinson and Pawlowski, cooperating with the Federal Bureau of Investigation).  From these conversations the jury learned the following.

In December 2014, Allinson—then an attorney at the law firm Norris McLaughlin—complained to Ruchlewicz about a legal services contract then-Mayor Pawlowski had diverted from Norris McLaughlin to another firm.  Allinson complained that he was now unable to "rally [his] troops with their checks."  P-Supp. App. 1234.[3]  He told Ruchlewicz he was "just talking our dialect of English" and explained, "[W]e've been unbelievably supportive in the past and now, you know, the work's going everywhere . . . but to our shop."  *Id.* at 1235.  He then confirmed with Ruchlewicz that this was "a short[-]term fixable issue."  *Id.*

---

[3] Citations to "P-Supp. App." refer to the Supplemental Appendix docketed by the Government in Pawlowski's appeal, whereas citations to "A-Supp. App." refer to the Supplemental Appendix docketed by the Government in this appeal.

Shortly thereafter, Ruchlewicz told Allinson that the City's current Parking Authority Solicitor would be fired and a Norris McLaughlin partner, Richard Somach, would be appointed in his place. He explained that Allinson would be the originating attorney for the appointment, allowing him to receive internal firm credit. But he also informed Allinson that the firm would need "to do something for the mayor's holiday party." *Id.* at 1239. Allinson responded by offering to write a check for $2,500 in the new year.

The men confirmed this arrangement a few days later. Ruchlewicz assured Allinson that Pawlowski would be "putting [the firm] on the [P]arking [A]uthority" and that Allinson would "get[] credit for it." *Id.* at 1241. Allinson warned Ruchlewicz, "[I]f I don't get the first call, and the first email, this will get fucked up and I'm not gonna be responsible for the fuck up." *Id.* at 1242. The latter reiterated that Allinson would "get the first call," to which Allinson responded, "Then, then everything is gonna be smooth, smooth as a baby's bottom." *Id.*

The two met again the following month. Ruchlewicz noted that he was solving Allinson's "[P]arking [A]uthority problems." *Id.* at 1153. Allinson stated, "That's the only problem, Sam, I'm telling you right now . . . [i]f you solve that problem, you get the golden goose. . . . You get everything." *Id.* at 1153–54. He cautioned Ruchlewicz, however, "The money flow comes from me. The golden goose comes to me." *Id.* at 1154. Ruchlewicz confirmed that Allinson would receive credit for the contract but reiterated that Pawlowski wanted him to raise money for the Mayor's campaign. Allinson replied, "Well of course I am going to raise money." *Id.* at 1155.

The next week, Allinson complained to Fleck and Ruchlewicz about "sore feelings" at the firm and told them that the Parking Authority job would "get the checkbooks back out." *Id.* at 1168. Referring to a specific fundraising request from Pawlowski, Allinson noted that "for us to come up with [$12,500], I think that's going to be a really heavy stretch unless I can say hey, good news, this is . . . the mayor's way of finding a good spot for us." *Id.* at 1169.

When Ruchlewicz relayed to Pawlowski Allinson's apparent reluctance to donate, the Mayor was incensed. He noted that he had "given [Allinson] millions of dollars" and declared, "[He] will get nothing now." *Id.* at 1296–97. "You know, fuck them," he continued. *Id.* at 1297. "And . . . I'm not gonna make Somach solicitor or anything. Screw it all." *Id.* Ruchlewicz asked Pawlowski not to do anything yet, as he and Fleck would be seeing Allinson again shortly.

At their next meeting, Allinson reiterated to Fleck and Ruchlewicz that if the firm was to receive the Parking Authority contract, he would "get a hundred percent of . . . the kind of credit that turns into money that goes out of my checkbook where you want it to go." *Id.* at 1178. He told them that he and the firm's chairman, Matthew Sorrentino, would ensure the firm contributed to Pawlowski's campaign, noting that "Matt understands everything," and "Matt and I have always spoken . . . the same language." *Id.* at 1179.

On the day of Pawlowski's Mardi Gras fundraiser, Allinson and Ruchlewicz again discussed the Parking Authority contract. Allinson reiterated the importance of receiving firm credit for the work. Ruchlewicz responded, "[Y]ou know what the mayor cares about. And the mayor's

6

got plans. He's got to raise money." *Id.* at 1202. Allinson then brought a $250 check—which, when talking to Pawlowski, Ruchlewicz referred to as "[i]nstallment number one"—to the fundraiser. *Id.* at 1204. Afterward, Ruchlewicz relayed to Pawlowski that Allinson wanted "it . . . known" that he had dropped off a check. *Id.* Ruchlewicz informed the Mayor that he had told Allinson they could now move forward with the "Somach to solicitor plan." *Id.* Pawlowski responded, "That's good." *Id.*

A few weeks later, Allinson told Fleck and Ruchlewicz that he would tell his law partners, "If you guys are going to handle the [City] work and deal with all that stuff, you're gonna have to work with [Fleck] and [Ruchlewicz] on . . . cobbling some money together. This isn't like we're being hired because we are good guys, it's not the way this shit works. . . . It just isn't. I don't care how good you are." *Id.* at 1251. When Ruchlewicz later checked in with Pawlowski about the Parking Authority contract, Pawlowski told him, "I'm working on it." *Id.* at 1214. Ruchlewicz told Pawlowski that Allinson would need to get the credit for bringing in the contract, as Allinson controlled the firm's political contributions. Pawlowski replied, "I got you." *Id.* at 1215.

Pawlowski then met with Allinson, Fleck, and Sorrentino (the firm chairman who "spoke[] the same language" as Allinson) to pitch them on a nascent senatorial campaign, and asked the firm to raise $25,000 before his June 30th fundraising deadline. Allinson later complained to Ruchlewicz that this was "a lot of fucking money when you're getting absolutely zero back from the [C]ity. I mean, I mean when I tell you bone dry, bone fucking dry." *Id.* at 1247.

7

Ruchlewicz responded, "Well, we'll have to change that. The mayor will." *Id.*

Norris McLaughlin contributed $17,300 to Pawlowski's campaign prior to the fundraising deadline. Fleck informed Pawlowski of the contribution and asked if they could now appoint Somach as Parking Authority Solicitor. Pawlowski told Fleck that he did not control the board's decisions but could talk to them. The men then discussed plans for getting rid of the current Solicitor.

Viewed in the light most favorable to the Government, this evidence showed the parties' plan to steer the Parking Authority contract to Allinson's firm in exchange for campaign contributions and was thus sufficient to support Allinson's bribery conviction. *See* 18 U.S.C. § 666(a)(2). His arguments to the contrary fall short.

Allinson first contends the evidence did not show an explicit *quid pro quo*, that is, that he gave or agreed to give campaign funds with the specific intent to influence Pawlowski to take a specific official action. *See McCormick v. United States*, 500 U.S. 257, 273 (1991).[4] He suggests that, while Fleck and Ruchlewicz repeatedly solicited funds from him, he

---

[4] In *McCormick*, the Supreme Court held that an explicit *quid pro quo* is required to convict a public official of Hobbs Act extortion premised on the exchange of campaign funds. *See* 500 U.S. at 273. We have yet to decide if the same holds true for federal programs bribery, *see United v. Willis*, 844 F.3d 155, 164 (3d Cir. 2016), and we need not do so here because we hold that there was enough evidence of an explicit *quid pro quo* anyway.

never clearly acquiesced to their requests. But a jury could find from the conversations and conduct detailed above that Allinson agreed to contribute, did contribute, and caused other firm attorneys to contribute to Pawlowski's campaign, with the specific intent of obtaining the Parking Authority contract. Although he presented at trial several Norris McLaughlin attorneys who testified that Allinson played no role in their contribution decisions, the jury had no duty to credit this testimony. He himself stated that he and Sorrentino "control[led] the flow of [the firm's] political donations," P-Supp. App. 1179, and they were the only firm lawyers to entertain Pawlowski's request for $25,000 in senatorial campaign contributions. Allinson complained to Ruchlewicz and Fleck shortly thereafter about the amount of the ask given the lack of legal work coming in from the City, was assured the Mayor would "change that," *id.* at 1247, and, the day before the fundraising deadline, the firm contributed thousands to Pawlowski's campaign. This evidence—which included the many conversations in which Allinson expressly contemplates exchanging donations for the Parking Authority job—was sufficient to show that he engaged in an explicit *quid pro quo*.

Allinson further submits that there was insufficient evidence of an "official act" as that term is defined in *McDonnell v. United States*, 136 S. Ct. 2355, 2367–69 (2016). The *McDonnell* Court interpreted the general federal bribery statute, which "makes it a crime for 'a public official or person selected to be a public official, directly or indirectly, corruptly' to demand, seek, receive, accept, or agree 'to receive or accept anything of value' in return for being 'influenced in the performance of any official act.'" *Id.* at 2365 (quoting 18 U.S.C. § 201(b)(2)). It narrowed the conduct that would constitute an "official act" under this provision: merely

9

"setting up a meeting, calling another public official, or hosting an event" is not enough. *Id.* at 2368. Rather, to prove an "official act," the prosecution must show "a 'question, matter, cause, suit, proceeding or controversy'" involving a "specific," "focused," and "formal exercise of governmental power." *Id.* at 2371–72.

The parties agreed prior to trial that the Government needed to prove that Allinson intended to influence an "official act" per *McDonnell*. We thus assume, but do not decide, that the Government had to show Allinson bought official acts. It met this burden. The Parking Authority solicitorship surely qualifies as a specific matter that would "be pending . . . before [a] public official, in such official's official capacity." *Id.* at 2365; *see also United States v. Repak*, 852 F.3d 230, 253 (3d Cir. 2017) (the awarding of a contract by a redevelopment agency's board of directors constitutes a "matter"). And a reasonable jury could find from Allinson's statements that he intended Pawlowski do more to help obtain the contract than merely "arrange a meeting" or perform some other informal action on the firm's behalf. The above conversations indicate Allinson's intent that Pawlowski use his public office to facilitate installing a Norris McLaughlin attorney as Parking Authority Solicitor. *See, e.g.*, P-Supp. App. 1241–42 (Ruchlewicz states that Pawlowski would "put[ the firm] on the [P]arking [A]uthority" and that Allinson would get the credit, and Allinson responds, "[I]f I don't get the first call, and the first email, this will get fucked up"). The evidence shows that this was Pawlowski's understanding, as well. *See, e.g.*, *id.* at 1296–97 (after learning of Allinson's reluctance to contribute, Pawlowski notes, "I'm not gonna make Somach solicitor or anything. Screw it all."); *id.* at 1288–89 (Pawlowski explains that he has "gotta get rid" of the then-

10

current Parking Authority Solicitor before a Norris attorney can be installed and strategizes ways of getting the Solicitor to resign); *see also McDonnell*, 136 S. Ct. at 2370 (it is an "official act" to agree to use one's office "to exert pressure on another official to perform an 'official act'"); *Repak*, 852 F.3d at 253 (it is an "official act" for a public official to use his or her power to influence the awarding of government contracts, even if the official lacks final decisionmaking power).

Finally, Allinson submits the Government's evidence was insufficient to prove that the sought-after contract was worth $5,000 or more, as required for a federal programs bribery conviction. *See* 18 U.S.C. § 666(a)(2). Yet the record suggests that Allinson himself understood the contract to be worth more than $5,000.[5] *See* P-Supp. App. 1251 (Allinson responds "[o]h yeah" to Fleck's assertion that "the Parking Authority bills a few hundred thousand a year"); *see also id.* at 1179 (Allinson states that if the contract "comes to me and I get the billing credit, then I get the full stack of cash on my side

---

[5] Allinson takes issue with the Government's reliance on two conversations between him and Fleck, wherein the latter stated that the Parking Authority contract was worth well over $5,000. He suggests that Fleck's valuation was unreliable, not only because Fleck lacked knowledge concerning the value of the contract but also because he was cooperating with the Government to develop its case against Allinson. But it is not Fleck's statement that supports the value of the transaction. Rather, it is Allinson's acceptance of Fleck's valuation that is relevant (along with his many other comments indicating that the Parking Authority contract was worth a great deal to him), as Allinson's valuation goes to the objective value of the contract.

11

to do what I need to do with it, annually"); *id.* at 1153 (Allinson tells Ruchlewicz that "[i]f you solve [the Parking Authority] problem, you get the golden goose"); *id.* at 1169 ("[F]or us to come up with [12,500] dollars [in campaign funds], I think that's going to be a really heavy stretch unless I can say, hey, good news, this is, this is the mayor's way of finding a good spot for us.").

Moreover, the amount of money Allinson agreed to contribute to Pawlowski's campaign indicates that the value of the proposed transaction exceeded $5,000. *See United States v. Zwick*, 199 F.3d 672, 690 (3d Cir. 1999) (finding a transaction to be worth more than $5,000 where the public official helped obtain permits in exchange for a $15,000 donation), *abrogated on other grounds*, *Sabri v. United States*, 541 U.S. 600 (2004). Allinson counters that the amount of the bribe cannot substantiate the transaction value where the subject of a transaction is a tangible interest. However, even assuming a legal services contract—and the internal firm credit Allinson hoped to receive from that contract—is "tangible," we have never said that the amount of a bribe cannot prove the value of the transaction where parties seek to exchange tangible assets. As Allinson notes, courts look to the bribe amount as one method for valuing an intangible asset, such as freedom for a prisoner, *see United States v. Townsend*, 630 F.3d 1003, 1011 (11th Cir. 2011), or a conjugal visit, *see United States v. Marmolejo*, 89 F.3d 1185, 1193–94 (5th Cir. 1996). But we have found no holding that the bribe amount is irrelevant in other contexts, and we decline to hold so here.[6]

---

[6] Which is not to say that the amount of a bribe will always support the value of the transaction. Rather, "the utility of looking to the bribe amount will vary depending on the

12

*See, e.g.*, *United States v. Richard*, 775 F.3d 287, 294 (5th Cir. 2014) (finding a school board superintendent position to be worth $5,000 or more based on the $5,000 bribe amount).

In sum, the Government's evidence easily suffices to support Allinson's bribery conviction.

**II.**

We next consider Allinson's argument that the indictment, which alleged a single conspiracy among Allinson and others, impermissibly varied from the evidence at trial that, he submits, proved only multiple, unrelated conspiracies.[7]

For a conspiracy, the Government had to establish an agreement to achieve an unlawful end, knowing and voluntary participation by the co-conspirators, and the commission of an overt act to further the agreement. *United States v. Gonzalez*, 905 F.3d 165, 179 (3d Cir. 2018). The evidence recounted above was sufficient for a jury to find that Allinson, Pawlowski, Fleck, and Ruchlewicz agreed to exchange

circumstances of the transaction." *United States v. Delgado*, 984 F.3d 435, 447 (5th Cir. 2021). If, for instance, an undercover government agent bribes a public official with $5,000, the price the agent is willing to pay for an asset may not be an accurate proxy for its market value.

[7] To the extent the Government suggests Allinson failed to preserve this argument, we disagree. While he may not have used the word "variance" in the trial court, we are satisfied that he sufficiently raised a variance theory, arguing that the Government failed to prove the single conspiracy alleged in the indictment.

campaign donations for a specific official act, that Allinson's involvement was knowing and voluntary, and that the men engaged in overt acts to further the scheme. Allinson does not seriously dispute this conclusion.

But he does raise a separate challenge. In its indictment, the Government charged Allinson with a single, "hub-and-spokes" style conspiracy involving not just Pawlowski and his political consultants, but also several other private vendors vying for government contracts. The evidence, Allinson contends, failed to show a single endeavor among all these alleged participants and instead showed several distinct schemes. *See United States v. Kemp*, 500 F.3d 257, 287–88 (3d Cir. 2007). In other words, while the Government may have proven separate agreements between the hub (Pawlowski) and the various spokes (the vendors) to exchange campaign funds for contracts, it failed to prove a "rim" connecting the spokes to one another. *See id.*

Where an indictment charges a single conspiracy but the evidence at trial proves only multiple, separate conspiracies, a variance occurs. *Id.* at 287. When faced with a variance argument, we must first decide "whether there was sufficient evidence from which the jury could have concluded that the government proved the single conspiracy alleged in the indictment." *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989). But unlike a "pure" sufficiency-of-the-evidence challenge, a successful variance challenge requires us to vacate a conviction only where the discrepancy between the indictment and the proof at trial prejudiced the defendant's substantial rights. *Kemp*, 500 F.3d at 287 n.4, 291.

14

To assess whether a single conspiracy, rather than multiple conspiracies, existed, we look for sufficient evidence of: (1) a common goal among the conspirators; (2) a common scheme wherein "the activities of one group . . . were 'necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture'"; and (3) overlap in the dealings of the conspiracy's participants. *Kelly*, 892 F.2d at 259 (quoting *United States v. DeVarona*, 872 F.2d 114, 118–19 (5th Cir. 1989)).

The Government argues its evidence proved a single conspiracy between Allinson and the other vendors. It asserts they all sought the same end—public contracts—the achievement of which depended on Pawlowski's satisfaction and success. It submits Allinson was aware that others contributed to Pawlowski's campaigns with the goal of influencing his official conduct. And it suggests that their enterprise was cooperative and mutually interdependent, as each had a shared motive in ensuring Pawlowski's electoral success so all could continue calling on his influence to obtain government work.

This single-conspiracy theory is appealing in the abstract; however, it finds little support in the record. There is no evidence that any of the alleged conspirators were motivated to contribute for any purpose other than to obtain their own individual contracts. *See Kemp*, 500 F.3d at 288 ("[A]lthough each of these alleged spoke conspiracies had the same goal, there was no evidence that this was a *common* goal." (emphasis in original) (quoting *United States v. Chandler*, 388 F.3d 796, 811 (11th Cir. 2004))). The record instead indicates that they gave campaign funds in exchange for their contracts because that is what Pawlowski and his

15

political consultants asked for—not to ensure that Pawlowski remained in a position to keep doling out official favors generally. *See Blumenthal v. United States*, 332 U.S. 539, 558 (1947). And while Allinson may have suspected that others donated to Pawlowski to secure government contracts, there is no evidence that he "derived [any] benefit" from his alleged co-conspirators' conduct, *see United States v. Smith*, 82 F.3d 1261, 1271 (3d Cir. 1996), or "aided in any way, by agreement or otherwise, in procuring" work for other would-be city contractors, *Blumenthal*, 332 U.S. at 558. Indeed, in its summation, the Government itself described this case as consisting of several "different schemes," rather than a single, overarching enterprise. App. 2830.

But even if the Government's proofs were insufficient to show a single conspiracy, our inquiry does not stop there. We must also determine whether Allinson was prejudiced by the variance between the indictment and the evidence. *See Kemp*, 500 F.3d at 291. As he was not, his conviction must stand.

In arguing otherwise, Allinson contends the variance affected his right "not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others." *Id.* (quoting *United States v. Schurr*, 775 F.2d 549, 553 (3d Cir. 1985)). Put simply, he alleges the separate conspiracy of Group A spilled over to Group B such "that the jury might have been unable to separate offenders and offenses and easily could have transferred the guilt from one alleged co-schemer to another." *Schurr*, 775 F.2d at 557 (quoting *United States v. Camiel*, 689 F.2d 31, 38 (3d Cir. 1982)).

16

Where, however, "the government compartmentalize[s] its presentation . . . as to each defendant separately" and the court "charge[s] the jury to consider the evidence against each defendant separately," there is little risk of spillover. *United States v. Greenidge*, 495 F.3d 85, 95 (3d Cir. 2007). That standard was met here. The evidence against Allinson was segregated, coming in through the testimony of Ruchlewicz and consisting of a series of recorded conversations, all of which involved or concerned Allinson. There was, moreover, no suggestion that evidence relevant to Pawlowski's agreements with other campaign contributors was relevant to proving Allinson's role in the conspiracy. *See Kemp*, 500 F.3d at 292 (no prejudice where the government "rigorously segmented its proofs and 'never suggested in any way that any piece of evidence related to [the separate defendants] was relevant to establish [the appellants'] participation in the conspiracy'"). And the District Court instructed the jury that "[y]our decision on any one defendant or any one offense, whether guilty or not guilty, should not influence your decision on any one of the other defendants or offenses," A-Supp. App. 16–17, and that "Allinson [was] not charged with conspiring to commit any offense other than federal programs bribery," *id.* at 27.

We recognize that the risk of prejudice "increases along with the number of conspiracies and individuals that make up the wrongly charged single conspiracy." *Kemp*, 500 F.3d at 292 (citing *Kotteakos v. United States*, 328 U.S. 750, 766–67 (1946)). The conspiracy charged in this case included over ten alleged co-conspirators and seven distinct sub-schemes, only one of which involved Allinson. Even so, the Government's efforts at trial were reasonably calculated to prevent guilt transference, and we see no reason to think they were

17

unsuccessful given the nature of the evidence in this case. We thus reject his variance challenge.[8]

## III.

Allinson also asserts that the Government constructively amended its indictment with respect to the bribery charge. A constructive amendment occurs "when evidence, arguments, or the district court's jury instructions effectively 'amend[] the indictment by broadening the possible bases for conviction from that which appeared in the indictment.'" *United States v. McKee*, 506 F.3d 225, 229 (3d Cir. 2007) (quoting *United States v. Lee*, 359 F.3d 194, 208 (3d Cir. 2004)). We exercise a fresh review over such claims. *United States v. Vosburgh*, 602 F.3d 512, 531 (3d Cir. 2010). If we determine that a constructive amendment occurred, it is "a *per se* violation of the [F]ifth [A]mendment's grand jury clause." *United States v. Syme*, 276 F.3d 131, 148 (3d Cir. 2002) (quoting *United States v. Castro*, 776 F.2d 1118, 1121–22 (3d Cir. 1985)).

The bribery charge here alleges that Allinson

> corruptly gave, offered to give, agreed to give, caused, and attempted to cause others to give,

---

[8] Allinson argues that his bribery conviction was tainted by prejudicial spillover from the conspiracy conviction, such that if we vacate his conspiracy conviction, we must also vacate his bribery conviction. *See United States v. Wright*, 665 F.3d 560, 575 (3d Cir. 2012). Because the conspiracy conviction stands, we do not address this contention.

something of value, that is, campaign contributions, to defendant EDWIN PAWLOWSKI and his political action committees . . . with intent to influence and reward defendant PAWLOWSKI in connection with the business, transaction, and series of transactions of the City of Allentown involving something of value of $5,000 or more, namely, legal services contracts awarded to [Norris McLaughlin].

App. 141. Allinson argues that the indictment's use of "awarded" refers to an alleged *quid pro quo* based only on legal-services contracts already given or awarded in the past, whereas at trial the Government asserted that the jury could convict Allinson even if no such work had been awarded to his firm.

Again we disagree. Allinson's reading of the charge is much too cramped, that is, it encompasses both past *and* prospective legal work to his firm. It indicates that Allinson "inten[ded] to influence" Pawlowski so legal services contracts would be awarded to the firm and intended to "reward" him for contracts already awarded to the firm. *Id.* Indeed, the bribery charge expressly incorporates Allinson's conduct as alleged in the conspiracy charge, such as its allegation that Allinson made and caused others to make campaign contributions in exchange for future contracts. *See id.* at 105 ¶ 33 (alleging he "made campaign contributions and caused others to make campaign contributions . . . in return for which [he] received, *and*

19

*anticipated receiving*, favorable treatment from [Pawlowski] in obtaining [C]ity contracts with the City of Allentown" (emphasis added)). The indictment contemplated a bribery conviction premised on anticipated legal work, and the District Court therefore did not err in finding that no constructive amendment occurred.[9]

**IV.**

Next, Allinson submits that the District Court erred in denying him a new trial based on an alleged misstatement of law in the Government's closing argument. We review this decision for abuse of discretion. *See United States v. Wood*, 486 F.3d 781, 786 (3d Cir. 2007). "To find that the court abused its discretion . . . we must first be convinced that the prosecution did in fact misconduct itself." *Id.* (quoting *United States v. Rivas*, 479 F.3d 259, 266 (3d Cir. 2007)). If so, we assess whether the prosecution's improper statement can be excused as harmless error. *United States v. Gambone*, 314 F.3d 163, 177 (3d Cir. 2003).

The Government's closing argument contained the following statement:

---

[9] Alternatively, Allinson alleges a variance between the indictment and the evidence of bribery presented at trial. But the Government's evidence showed that Allinson agreed to contribute to Pawlowski's campaign to obtain the Parking Authority contract for his firm, and these facts do not "materially differ[]" from those alleged in the indictment. *See Vosburgh*, 602 F.3d at 532.

> Bribery happens with a wink and a nod and sometimes a few words, an understanding between two people, we all know what's happening here. You're giving me this, I'm giving you that.

App. 2473. According to Allinson, this line suggested to the jury that the *quid pro quo* agreement between the parties could be implicit—a lower burden than proving an explicit *quid pro quo*. *See United States v. Antico*, 275 F.3d 245, 257–58 (3d Cir. 2001).

But the Government's statement is consistent with the law, which recognizes that bribery can occur through "knowing winks and nods." *See Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring). Nowhere in its summation did the Government use the term "implicit" or suggest that "a wink and a nod" would, standing alone, be sufficient to convict. Rather, it repeatedly stated that it was required to show "a clear, unambiguous understanding between the parties that the campaign contribution was being offered in exchange for the official action by the mayor"—that is, an explicit *quid pro quo*. App. 2472; *see also id.* (informing the jury that the *quid pro quo* must be "clear and unambiguous, leaving no uncertainty about the terms of the bargain"). This same statement of the law was echoed in the jury instructions, which were approved by all parties. A-Supp. App. 45 ("The explicitness requirement does not require an official's specific statement that he will exchange official action for a contribution, but rather requires that the quid pro quo be clear

21

and unambiguous, leaving no uncertainty about the terms of the bargain.").

The Government's closing remark was not improper when considered in context, and the District Court did not abuse its discretion in denying Allinson a new trial because of it. In any event, the Government's case against Allinson consisted of far more than mere "winks" and "nods." As explained above, its evidence proved an explicit *quid pro quo*. Thus, even were its closing statement improper, any conceivable error was harmless.

## V.

We last consider Allinson's argument that the District Court erred in denying the motion to sever his trial from Pawlowski's. Again we review the Court's decision for abuse of discretion. *United States v. Walker*, 657 F.3d 160, 170 (3d Cir. 2011).

"Ordinarily, defendants jointly indicted should be tried together to conserve judicial resources." *United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir. 1991). Yet Allinson (continuing with his defense theme of prejudicial spillover) contends that a joint trial was improper because the "sweeping charges against Pawlowski and others" led the jury to convict him. Allinson Br. 41. But "[n]either a disparity in evidence, nor introducing evidence more damaging to one defendant than others[,] entitles seemingly less culpable defendants to severance." *Eufrasio*, 935 F.2d at 568. Allinson must instead show real prejudice arising from the joint trial either compromising his trial rights or preventing the jury "from making a reliable judgment about guilt or innocence." *United*

22

*States v. Lore*, 430 F.3d 190, 205 (3d Cir. 2005) (quoting *United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005)). He fails to do so.

The District Court instructed the jurors that "[e]ach offense and each defendant should be considered separately." A-Supp. App. 17. It told them that evidence "admitted solely against Edwin Pawlowski cannot be considered by you in determining the guilt or the innocence of Scott Allinson," and that "[y]our decision on any one defendant or any one offense, whether guilty or not guilty, should not influence your decision on any one of the other defendants or offenses." *Id.* at 16–17. "[J]uries are presumed to follow" such limiting instructions. *Zafiro v. United States*, 506 U.S. 534, 540–41 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

This case was not, moreover, so complex that the jury could not "reasonably be expected to compartmentalize the evidence" against Allinson. *United States v. Ward*, 793 F.2d 551, 556 (3d Cir. 1986) (quoting *United States v. Wright-Barker*, 784 F.2d 161, 175 (3d Cir. 1986)). As previously discussed, the evidence against him was segregated and largely consisted of his own recorded statements. Allinson fails to show "clear and substantial prejudice" resulting from the joint trial, and thus he fails to meet the high bar required to gain a severance. *Urban*, 404 F.3d at 775.

\* \* \* \* \*

The jury here was privy to private conversations in which Allinson and Pawlowski repeatedly expressed their intent for Norris McLaughlin to receive the Parking Authority contract and Allinson the credit, all in exchange for political

23

donations.  Allinson's words and actions were sufficient to support his bribery and conspiracy convictions.

Moreover, while we see little evidence in the record to support the Government's single-conspiracy theory, any variation between the indictment and the evidence was not prejudicial.  The Government's efforts at trial were sufficient to avert the risk that jurors might transfer guilt from the alleged co-schemers to Allinson.  And as to his other claims of error, there was no impermissible amending of the bribery charge, the Government's closing statement was not improper, and Allinson was not prejudiced by having his trial remain joined with that of Pawlowski.  We thus affirm.