PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-9000
_____

RICHARD ROLAND LAIRD,
                                    Appellant
v.

SECRETARY, PENNSYLVANIA DEPARTMENT OF
CORRECTIONS;
SUPERINTENDENT OF THE STATE CORRECTIONAL
INSTITUTION AT GREENE; SUPERINTENDENT OF
THE STATE CORRECTIONAL INSTITUTION AT
ROCKVIEW; THE DISTRICT ATTORNEY OF THE
COUNTY OF BUCKS;
THE ATTORNEY GENERAL OF THE
COMMONWEALTH OF PENNSYLVANIA
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2:11-cv-01916)
District Judge:  Honorable Jan E. DuBois
_____

Argued October 8, 2024
Before:  RESTREPO, PHIPPS and FISHER, *Circuit Judges*.

(Filed: February 26, 2025)

Lisa Evans Lewis, Chief Federal Defender
Cristi A. Charpentier
Joseph W. Luby    **ARGUED**
Federal Community Defender Office for the Eastern District
of Pennsylvania
Capital Habeas Unit
601 Walnut Street
The Curtis Center, Suite 545 West
Philadelphia, PA 19106
        *Counsel for Appellant*

Jennifer M. Schorn, District Attorney
John T. Fegley, Chief of Appeals    **ARGUED**
Bucks County Office of District Attorney
Bucks County Justice Center
100 N Main Street
Doylestown, PA 18901
        *Counsel for Appellees*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

This is an appeal from a denial of a petition for writ of habeas corpus, under 28 U.S.C. § 2254, raising a *Strickland v. Washington* claim of ineffective assistance of counsel. Over thirty years ago, Defendant-Appellant Richard Laird committed a vicious murder with his friend and co-conspirator,

2

Frank Chester, ending the life of Anthony Milano, a 26 year-old homosexual man. Twice, Laird was tried for and convicted of first-degree murder and sentenced to death. Throughout the past years, Laird has sought multiple forms of post-conviction relief but presently has only a penalty-phase *Strickland* claim. The claim asserts that Laird's trial counsel was ineffective for failing to retain and present an additional penalty-phase expert witness to address the sexual abuse that Laird suffered as a child. Like the District Court before us, we conclude that Laird's petition fails to entitle him to relief. We, therefore, will affirm.

## I.[1]

### A. Factual History

### 1.    Laird and Chester Murder Milano

In the early morning hours of December 15, 1987, Milano was brutally murdered in a wooded area in Bristol, Pennsylvania. He was beaten. His neck and throat were slashed numerous times—to the point where his head was nearly severed from his spinal cord. He sustained a hairline fracture to the base of his skull. And he eventually died from aspirating his own blood for between five and ten minutes.

The events leading up to the murder began around 11:30

---

[1] The state-court record in this case spans over 15,000 pages. As this appeal covers both state and federal litigation, we cite to the state-court record as it appears on this Court's federal appellate docket (Dkt.). We also reference the District Court docket (Dist. Dkt.). For purposes of Factual History, most facts are those underlying Laird's 2007 retrial and first-degree murder conviction, as summarized by the Pennsylvania Supreme Court on direct appeal. *See Commonwealth v. Laird*, 988 A.2d 618 (Pa. 2010).

p.m. on December 14, 1987, when Milano encountered Laird and Chester at the Edgely Inn. Milano had never before met the two men, so a few hours of interaction occurred between the three, during which (as the bartender testified) Laird and Chester taunted Milano about his masculinity—the taunts centered on their contention that he was gay. The men used homophobic slurs to refer to Milano and expressed generalized laments as to the "infiltration" of homosexuals in modern society. A151 ("[Laird] used derogatory terms such as 'fag' when speaking of Milano to others at the bar, and at one point expressed to the bartender that he . . . was 'sick and tired of these people trying to infiltrate us.'"); *see also* Dkt. 116-37, at 216, 243. Laird and Chester also, in apparent mockery, slow danced together while laughing. The bartender warned Milano that the men "were just out to cause some trouble" and that he should leave. Dkt. 116-37, at 214. After about three hours at the bar, Milano, Laird, and Chester left the Inn together, with Milano agreeing to Laird's request to drive him home. After driving around for an hour, Laird and Chester directed Milano to drive into a wooded area, where he stopped along the side of the road and got out of his car.

Once Milano exited the vehicle, physical violence against him began. Chester punched or kicked Milano in the head, knocking him to the ground. Then, Laird jumped on top of Milano, wrestling and pinning him. Using a box-cutter, Laird slashed Milano's shoulder, neck, and throat—severing at least two vertebrae in the process. Milano was found lying face up with his left eye partially open, bruises to his facial area (including a hairline fracture to the skull and flattening of the brain consistent with blunt trauma and brain hemorrhaging), and innumerable slashes on his neck and throat. The cuts were so deep that Milano was nearly decapitated. He aspirated on a tremendous amount of his own blood for five to ten minutes

before he bled to death. His severe and rapid loss of blood was caused and compounded by cerebral trauma. After Laird and Chester slayed Milano, they fled the scene on foot to a nearby friend's house.

### 2. Laird Attempts to Hide the Murder

The day after the murder, Laird's girlfriend saw him place his blood-covered keychain as well as his previous day's clothing into a plastic bag, which he then discarded in a dumpster in a nearby town. Testimony at trial revealed: Laird kept his box-cutter with him at all times; Laird disposed of his box-cutter in a creek after the murder; Laird asked his girlfriend if she would "be an alibi"; Laird repeatedly advised Chester not to discuss the incident with anyone and he stated, "[N]o evidence, no crime." A10, A152. During the investigation, Chester cooperated with police by giving them permission to intercept his calls with Laird. Laird was recorded suggesting Chester leave town, indicating his intention to "hide until this blows over," recommending ways to pass a polygraph test, commenting on the district attorney's inability to prove a case without evidence, and expressing his belief that criminal homicide is subject to a seven-year statute of limitations. *Id.*

### B. Procedural History

On December 22, 1987, two days after the recorded phone call, Laird and Chester were arrested in connection with the killing.

### 1. The First Trial and Direct Appeals (1988)

In May 1988, Laird was tried for multiple offenses in a joint capital trial with Chester, in the Court of Common Pleas of Bucks County. Both men testified and admitted to being present at Milano's murder, but they each blamed the fatal wounds on the other. The jury found both men guilty of first-

degree murder, second-degree murder, third-degree murder, kidnapping, and other offenses. Laird presented only one witness at the penalty phase, Barbara Parr, his then-girlfriend and the mother of his infant child. Both Laird and Chester were sentenced to death.

On appeal, in March 1991, the Pennsylvania Supreme Court affirmed the convictions and sentences. *Commonwealth v. Chester*, 587 A.2d 1367, 1371–72 (Pa. 1991). The United States Supreme Court denied certiorari. *Laird v. Pennsylvania*, 502 U.S. 849 (1991).

## 2. Post-Conviction Relief Attempts after the First Trial (1988–99)

Laird filed a collateral attack, seeking post-conviction relief under 42 Pa. C.S. § 9546(d), Pennsylvania's Post Conviction Relief Act (PCRA). From 1993 to 1997, the PCRA Court held multiple evidentiary hearings on Laird's claims, including a contention that Laird's trial counsel had been ineffective in the investigation and presentation of penalty-phase mitigating evidence. Among those who testified were: Laird's younger brother by four years, Mark Laird; neuropsychologist Dr. Henry Dee; and psychiatrist Dr. Robert Fox.

Mark's testimony centered around his and Laird's upbringing. He shared details about the brothers' relationship with their father, Richard Laird Senior, an alcoholic who verbally and physically abused his children and wife. Mark recounted these instances of abuse—abuse he and his brother both endured and witnessed. He described instances where he would walk into a room to discover his father and his brother naked, after which Laird Senior would throw Mark out of the room. Also, Mark testified about the multiple head injuries that Laird suffered as a child.

6

The doctors' testimonies collectively span hundreds of transcript pages, centering on Laird's mental health—both Dr. Dee and Dr. Fox had previously evaluated Laird, reviewed his records, and interviewed witnesses. Dr. Dee testified about the verbal, physical, and sexual abuse that Laird had suffered and the effects of that abuse on him. He shared that although Laird had not told him which male relative sexually abused him— just that a male relative had—Mark had told him during his interview that the abuser was their father. Dr. Dee explained that Mark did not understand that sexual abuse was occurring when he was a child, but "later understood from [Laird] that [Laird] was forced to perform fellatio on his father many, many times throughout childhood. Up until the age of nine." Dkt. 116-51, at 89. Dr. Dee also testified about Laird's long history of alcohol and substance abuse, which had begun by the time Laird was about nine years old.

Dr. Fox's testimony addressed the same topics as Dr. Dee's testimony. Dr. Fox detailed Laird's mental illness, including his post-traumatic stress disorder (PTSD) and attention-deficit/hyperactivity disorder (ADHD). Like Dr. Dee, Dr. Fox had learned from Mark that Laird Senior sexually abused Laird. Dr. Fox testified that when he had asked Laird, "in the gentlest and least confront[ational] manner possible," whether he had been sexually abused, Laird became "extremely distressed." Dkt. 116-54, at 132–33. In light of Laird's reaction, "this part of [the] interview was relatively brief and curtailed by [Dr. Fox] because [he] didn't want to cause [Laird] distress." *Id.* at 133. Dr. Fox analogized his questioning of Laird about the sexual abuse he endured to "torturing an animal in a cage." *Id.*

Ultimately, Laird's attempts at state post-conviction relief were unsuccessful. In September 1997, the PCRA Court denied relief, and in March 1999, the Pennsylvania Supreme

Court affirmed. *Commonwealth v. Laird*, 726 A.2d 346, 349–51, 357–58 (Pa. 1999) (concluding that the PCRA Court erred in reasoning that none of Laird's penalty-phase claims were cognizable but nevertheless holding that his mitigation-related ineffective-assistance claim lacked merit).

### 3. Federal Habeas Attempts after the First Trial (1999–2006)

In September 1999, after exhausting his avenues of state-court collateral attack, Laird sought federal habeas relief under 28 U.S.C. § 2254 in the U.S. District Court for the Eastern District of Pennsylvania. Two years later, the District Court granted relief in part. *Laird v. Horn*, 159 F. Supp. 2d 58, 67 (E.D. Pa. 2001). The claims on which relief was granted included a guilt-phase claim and multiple penalty-phase claims. To remedy what the Court determined to be violations of Laird's due process rights, the Court vacated without prejudice Laird's first-degree murder conviction and death sentence but left his other convictions undisturbed. In July 2005, we affirmed, addressing only Laird's guilt-phase claim. *Laird v. Horn*, 414 F.3d 419, 421 n.1, 430 (3d Cir. 2005). We directed that the case be returned to the state court for the Commonwealth to either retry Laird for first-degree murder, followed by a new sentencing hearing, or to sentence Laird on the second-degree murder conviction and remaining charges. *Id.* at 430 n.9. In January 2006, the U.S. Supreme Court denied review. *Beard v. Laird*, 546 U.S. 1146 (2006).

### 4. The Second Trial (2007–10)

In January and February 2007, the Commonwealth retried Laird for first-degree murder in the Court of Common Pleas of Bucks County. Attorneys John J. Kerrigan, Jr. and Keith J. Williams were appointed to jointly represent Laird, with Kerrigan as lead counsel during the guilt phase and

8

Williams as lead counsel during the penalty phase. At the time of appointment, both Kerrigan and Williams had been practicing for decades and had previous experience defending capital murder cases. Though the two attorneys split responsibility between the phases of the trial, they "did help out each other in each other's areas." Dkt. 116-35, at 139.

The defense strategy differed from Laird's first trial because Laird elected not to testify during his retrial.[2] Instead, he "admitted to having murdered Milano and sought only to show he could not have formed a specific intent to kill" necessary to convict him of first-degree murder. *Commonwealth v. Laird*, 988 A.2d 618, 631 (Pa. 2010). To prove Laird lacked the requisite mental state, his trial counsel asserted a defense of diminished capacity, which they alleged resulted from combined effects of Laird's extreme intoxication on the night of the offense and his preexisting brain damage.

During the guilt phase, Laird called four expert witnesses to support his defense—Dr. Dee, Dr. Fox, psychiatrist Dr. John O'Brien, and toxicologist Dr. Gary Lage. The testimony mainly concerned Laird's history of alcohol and substance abuse, supporting defense counsel's theory that Laird experienced diminished capacity at the time of the murder. *See* Dkt. 119-1, at 9 (Dr. Lage estimated that Laird's blood-alcohol level at the time of the murder was about 0.45).

---

[2] Laird's and Chester's testimony from the original trial was read to the jury as part of the Commonwealth's case-in-chief. Partway through the reading of Chester's testimony, the trial judge ordered the testimony be read but not re-transcribed, to which the parties did not object. Therefore, the remainder of Chester's testimony was not transcribed, nor was any of Laird's testimony. Accordingly, we cite to the first trial's transcript when referring to their testimony.

The Commonwealth presented testimony that Laird was not staggering or swaying when he left the bar, nor was he stumbling or slurring his words at his friend's house following the murder. The jury was not persuaded by Laird's defense—it returned a unanimous guilty verdict after less than two hours of deliberation.

In mid-February 2007, the penalty phase began. The Commonwealth relied on the evidence presented during the guilt phase to present two aggravating factors: (1) murder in the course of committing a felony (kidnapping) under 42 Pa. C.S. § 9711(d)(6), and (2) commission of the offense by means of torture under 42 Pa. C.S. § 9711(d)(8). The parties stipulated to the felony aggravating factor because Laird's original conviction on kidnapping was left undisturbed by the federal court's grant of habeas relief.

During the two-day hearing, Laird called six witnesses to support his mitigation case. Three of those witnesses' testimonies are directly relevant to this appeal.

Mark testified about the brothers' shared childhood—recalling in detail the abuse their father inflicted on their mother and them, as well as the events that led to Laird's serious head injuries. He discussed Laird's struggles with alcohol and substance abuse—recounting times when he would go out looking for Laird and find him "shit-faced, either passed out or just sitting there." Dkt. 116-46, at 234–37. Mark also testified about the circumstances surrounding what he later (in adulthood) understood to be their father's sexual abuse of Laird. When asked whether there was sexual abuse going on in the household, Mark responded:

> Yeah. I remember crying because I would be knocking on the door wanting to play with my brother and my father and I wasn't allowed in.

10

> Of course, they were naked at the time and I
> didn't really understand it at the time what was
> going on but I do remember that. I don't know
> the specifics of what happened. I just remember
> wanting to go into the room and not
> understanding why I wasn't allowed in.

*Id.* at 220–21. When asked whether Mark's relationship with his father or brother changed after this experience, Mark responded: "This was the norm for me, so I didn't notice any difference . . . . Eventually, the beatings and shit got so bad that my mother got the balls to leave him." *Id.* at 231–32.

Dr. Dee and Dr. Fox again testified about Laird's life history and mental impairments and diagnoses. They explained their preparation for Laird's interviews—which included reviewing his school records, military records, and court records—and details of their interviews with Laird's brother, his mother, and Laird himself.

Dr. Fox testified that collecting Laird's history revealed that he "was raised in a very chaotic and abusive family." He explained that he interviewed Laird a decade earlier in 1996, in preparation for Laird's first trial, as well as more recently, the week before the retrial's penalty phase. Dr. Fox noted that what Laird revealed to him during the more recent interview "was, essentially, the same as what he had said to [him] ten years ago." Dkt. 116-36, at 8. For example, the interviews revealed that Laird Senior was "physically, psychologically and sexually abusive to [Laird] and physically abusive and psychologically abusive to [Laird's mother and brother]." *Id.* at 6–7. On direct examination, Dr. Fox testified that the culminating circumstances of Laird's difficult childhood—the abuse, alcohol and drug issues, and head injuries—led him to diagnose Laird with ADHD, PTSD, polysubstance

11

dependence, mood disorder due to head trauma, alcohol dependence, and extreme mental disturbance. Dr. Fox explained each of these diagnoses in detail, including his opinion of how they affected Laird.

Dr. Fox also testified about the sexual abuse that Laird endured and its effects on him. Dr. Fox answered in the affirmative—both on direct and cross-examination—to the question of whether it was his opinion that Laird was a victim of sexual abuse. On cross, Dr. Fox conceded that Laird was not willing to describe his sexual abuse during his 1996 interview, which lasted "for a long, long period of time [two and a half hours]." *Id.* at 27. At that time, Laird became agitated and responded with "emotionality," *id.*, declining to answer questions about details. This response differed from Laird's more recent interview, during which Laird admitted "that he was sexually abused by his father when he was a boy[,] [describing] that his father [had] forced him to perform oral sexual acts on him." *Id.* at 17. Dr. Fox also answered questions about the psychological effect of abuse on "children who have been systematically abused," like Laird. *Id.* at 29.

Dr. Dee testified about his interviews with Laird, too. Like Dr. Fox, he had interviewed Laird in preparation for the first trial and again, shortly before the retrial's penalty phase began. Dr. Dee's testimony covered the same general topics as Dr. Fox's—noting, "[Laird's] childhood was marked by quite severe abuse of all kinds—physical abuse, emotional abuse and sexual abuse." *Id.* at 59. Regarding the issue of sexual abuse, Dr. Dee testified that Laird told him that a male family member had sexually abused him, but Laird did not disclose the identity of the male family member, Laird Senior. So, Dr. Dee did not learn that Laird's abuser was his father until he later interviewed Mark. Dr. Dee recounted Laird's description of the abuse. Laird Senior would force Laird to perform fellatio, after

12

which he "would humiliate him and further emotionally abuse [Laird] by telling him he was a filthy, he was a nasty boy, to go wash out his mouth and [he] shouldn't be doing things of that sort, which, of course, is terribly confusing to anybody." *Id.* at 61. While Laird Senior physically and emotionally abused the other members of the family, his sexual abuse was apparently restricted to Laird.

Dr. Dee also testified about the sources he relied on in forming his professional opinion. On cross, he was asked about a part of his interview report where he "noted that . . . Laird had a long[-]smoldering antagonism toward persons identified as homosexuals, and that might have been why [he] fastened upon Anthony Milano." *Id.* at 97–98. Further, the Commonwealth refreshed Dr. Dee's recollection of Dr. David Silverman's report, which Dr. Dee had reviewed when diagnosing Laird. In the report, Dr. Silverman stated that Laird "hated homosexuals." *Id.* at 98. On redirect, Dr. Dee stated about his work as an expert: "[A] significant part of my practice is child welfare cases where children are abused." *Id.* at 107. The defense rested shortly after.

Laird's penalty-phase defense was, like his guilt-phase defense, unpersuasive to the jury, which returned a verdict of death. The jury unanimously found that the Commonwealth had proven the kidnapping aggravating factor but not the torture aggravating factor. At least one juror found the following mitigating factors: physical abuse, sexual abuse, emotional abuse, witness to the abuse of others, psychological consequences of abuse, substance abuse, alcohol abuse, and conduct in prison. The only proposed mitigator that no juror found was that Laird stipulated to having participated in the murder. Still, the jury unanimously concluded that the aggravating factor outweighed the mitigating factors.

13

In February 2010, the Pennsylvania Supreme Court affirmed Laird's retrial conviction and sentence. *Commonwealth v. Laird*, 988 A.2d 618 (Pa. 2010). In November 2010, the U.S. Supreme Court denied certiorari. *Laird v. Pennsylvania*, 562 U.S. 1069 (2010).

5.      Post-Conviction Relief Attempts after the Retrial (2011–Present)

In November 2011, Laird began federal habeas corpus proceedings, which were stayed in March 2012 for Laird to expeditiously exhaust his state court remedies. He initiated proceedings under the PCRA and moved for a stay of execution, which was granted.

a.      The Second PCRA Case—Hearing Testimony & PCRA Court Decision

Among Laird's claims was an argument that "trial counsel unreasonably failed to investigate and present compelling mitigating evidence," Dkt. 116-23, at 425, including "testimony from an expert in male sexual abuse," *id.* at 427. According to Laird, such an expert would have "been able to educate jurors on the devastating implications of abuse by a family member[]" and "been equipped to explain how and why men process such abuse and if and when victim[]s are able to reveal the abuse and the identity of the abuser." *Id.* at 427–28. Laird's amended petition notes that he had recently been interviewed by Dr. David Lisak, "a clinical psychologist with almost 25 years of experience in the field of [effects of] childhood physical and sexual abuse on later development, especially in men." *Id.* at 428. Laird said he provided new details of his experience during this interview, including his age during the abuse (five to eleven years old) and that his father would ejaculate into his mouth and routinely anally rape him. The amended petition claims, "To this day, [Laird]

14

experiences 'body memories' from the abuse, including gag impulses, sharp rectal pain and other tactile memories." *Id.* at 429. Laird argued that, had the jury been provided with these "powerful details" of his life story, there was a reasonable probability that at least one juror would have weighed the aggravating and mitigating factors differently. *Id.* at 425.

From April through September 2012, the Court held multiple evidentiary hearings on Laird's PCRA claims. Several witnesses testified, including Mark, Dr. Lisak, and Williams, among others. Mark's testimony included details of the abuse from his and Laird's childhood. Mark provided one new piece of information about the sexual abuse: He recalled "[p]retty regular" instances "where it would be just [Laird Senior] and [Laird] after a shower, laying there in a towel with an ashtray, a pack of Winstons." Dkt.116-46, at 46. On cross, Mark again conceded that he never actually saw Laird Senior sexually abuse Laird.

Dr. Lisak's testimony reviewed his opinion of Laird's childhood trauma—based on his two meetings with Laird, his interview of Mark, and his analysis of relevant records (including Laird Senior's military records). Mark told Dr. Lisak about the "very routine occurrence" of Laird Senior emerging from his morning shower in a towel and pulling Laird out of the boys' bedroom or telling Mark to get out of the bedroom and closing the door. Dkt. 119-3, at 77. Years later, Mark understood these instances as the routine which preceded Laird's sexual abuse.

Describing his interviews with Laird, Dr. Lisak testified that, when he would begin to ask Laird questions about his sexual history, Laird would turn pale and start sweating; his breathing rate would increase as his body went rigid; and he would avert his gaze. When Dr. Lisak asked about Laird

15

Senior, Laird responded, "[T]he sick fuck would rub his dick between my cheeks." *Id.* at 93. Laird recounted two routine ways his father would sexually abuse him—one of which was consistent with Mark's description—telling Dr. Lisak that Laird Senior orally and anally raped him for years.

Dr. Lisak explained the methodology he employed while questioning Laird about sexual abuse, which involves "difficult and sensitive information." *Id.* at 81. He testified that, when Laird was interviewed by other experts five years prior in 2007, there was a common understanding among practitioners—Dr. Lisak called it the "dominant culture"—that direct questions would probably not elicit information from a victim of alleged sexual assault. *Id.* at 88–89. Rather than asking point-blank if an individual had been sexually abused, Dr. Lisak's approach was to ask about the person's "sexual history" and "sexual experience." *Id.* at 81. When pressed, Dr. Lisak explained that:

> Most people who were sexually abused don't think of it that way [as assault]. They very often, people who have been severely abused, whether it's sexually or physically, simply don't walk around with that kind of a scheme about what happened to them. So if you ask the question that way, they're quite likely to say no, even though they've had experiences that absolutely were sexual abuse or physical abuse.

*Id.* at 88–89. Dr. Lisak's opinion was that Laird would have provided more details in response to an indirect form of questioning, had Dr. Lisak been the one to interview him in 2007. *Id.* at 185.

Dr. Lisak also opined about the effects of the abuse on Laird's development. Laird described to Dr. Lisak extreme

16

feelings of inferiority, as if "something [was] profoundly wrong with him . . . a symptom referred to as internalization." *Id.* at 115. Dr. Lisak testified that these feelings led Laird to develop "a kind of a persona of hyper-masculinity to counter what he really felt about himself." *Id.* Additionally, Dr. Lisak noted that "Laird described a life-long reaction, negative reaction to any touch from a male," to the point where Laird could not even tolerate having a man cut his hair. *Id.* at 201–02.

Attorney Williams's testimony covered his and Kerrigan's qualifications as well as details of Laird's refusal to discuss his allegations of sexual abuse during preparation for the 2007 retrial. Williams explained he had "represented many defendants on capital cases, but [he had] handled the guilt phase[s] in all the other [cases]." Dkt. 116-35, at 139–40. His first experience as penalty-phase counsel was for Laird. Williams testified that, before the retrial, there was "some feeling that there had been sexual abuse, but that . . . Laird was reluctant to talk about it." *Id.* at 156. Then, "the sexual abuse was only an allegation" that Laird "wouldn't even talk to [Williams] about." *Id.* at 158. Still, Williams testified that he looked for further corroborative evidence of the sexual abuse, including by searching for more information about Laird Senior. When asked if he could have hired experts specifically trained in eliciting sexual abuse history, Williams responded:

> I guess, sure. I mean I had experts, I was using the experts I had, I didn't – never crossed my mind to go out and find some new special expert who could more – was more capable of getting under Mr. Laird's skin and finding it out. No, we had experts. I relied on those experts, I relied on what Mr. Laird told me, I relied on what his brother told me, I relied on the other witnesses

17

we talked to during the whole investigation.

*Id.* at 158. Williams noted that "Kerrigan took the lead on the experts because he was using them first in the guilt phase." *Id.* at 168.

Williams also discussed the strategy behind the defense's witness presentation. He explained that Mark's testimony during the 1997 PCRA proceedings was longer than his 2007 penalty-phase testimony because "between the time of the PCRA and the time of trial, Mark Laird was no longer a cooperative witness for us. He really didn't want to be there and was not going to be as forthcoming as he was at the prior hearing." *Id.* at 170. When asked about this same difference in the testimony of Dr. Dee and Dr. Fox, Williams explained that the goal of the guilt phase was to show "some kind of diminished capacity," which required evidence of Laird's history of substance abuse, but the goal of the penalty phase was to show "the abuse and the long-term effects of the abuse." *Id.* at 173–74. Williams also testified that he "didn't want [Dr. Dee and Dr. Fox] on the stand too long" during the penalty phase because the jury had not "believed" them during the guilt phase. *Id.* at 193–94.

In orders entered in May 2012 and August 2013, the PCRA Court denied relief. It determined that Laird failed to show that his trial counsel was unreasonable for failing to retain an additional expert to testify regarding his sexual abuse. The PCRA Court held that Dr. Lisak "uncovered . . . details of physical, emotional, and sexual abuse from [Laird's] father" that were "similar" to what was presented at the penalty phase but altogether not significantly new or different. Dkt. 116-23, at 320. The PCRA Court opined:

> [Laird] also argues that counsel were ineffective
> in failing to retain an expert to testify regarding

18

sexual abuse. [Laird's] current counsel met with a Dr. David Lisak, a clinical psychologist. However, [Laird] assert[ed] no significantly new information or diagnoses that were not presented at the penalty phase. Certainly, doctor after doctor could evaluate [Laird] and likely uncover additional details from [his] past with different theories about how those events in his life impacted him. Nonetheless, trial counsel presented testimony directly from a family member and through two different experts who conducted multiple interviews. The experts presented opinions that [Laird] suffered from physical, sexual, emotional, and psychological abuse, had diagnoses of brain damage, memory impairment, drug and alcohol dependence, ADHD, and PTSD. Trial counsel were not ineffective for failing to present additional details that would have been insignificant considering the evidence as a whole.

*Id.* (internal citations omitted).

b. The Second PCRA Case—Laird's Appeal & Pennsylvania Supreme Court Decision

In 2015, on appeal, the Pennsylvania Supreme Court affirmed the PCRA Court's denials of relief, and the U.S. Supreme Court denied certiorari. *Commonwealth v. Laird*, 119 A.3d 972, 1012 (Pa. 2015), *cert. denied*, 562 U.S. 1069 (2010).

The Pennsylvania Supreme Court opinion addressed Laird's contention that "an expert such as Dr. Lisak could have described how [Laird Senior's] actions in sexually abusing him over a period of years led to an emotional state that included confusion, self-loathing, guilt, shame, and humiliation." *Id.* at

19

997. But it did not find persuasive Laird's argument that "there is a meaningful distinction between the 'almost bald assertions of abuse and impairment that jurors heard and a detailed and corroborative narrative that would have been offered by effective counsel.'" *Id.* (quoting Laird's Brief at 20). Instead, the Court held "that the experts who testified at the penalty hearing provided significant, detailed information concerning [Laird's life history]." *Id.* The Court recognized that:

> Dr. Lisak was . . . able to provide some additional perspective concerning the level of vulnerability felt by children who are abused . . . and the tendency of abused boys to deal with such feelings of vulnerability by adopting what the expert termed a hyper-masculine persona as they progress into adolescence. Still, the factual information Dr. Lisak could have supplied about [Laird's] childhood would have been largely cumulative of that provided by Drs. Dee and Fox, as well as Mark Laird, all of whom informed the jury about the nature and severity (and several examples) of the physical and sexual abuse [Laird] suffered at the hands of his father.

*Id.* at 998 (internal citations omitted).[3]

Though the Court did not agree with the PCRA Court that "Dr. Lisak's testimony would have been 'insignificant,'" it nevertheless did not believe that the testimony would have been reasonably likely to convince a juror to alter the balancing of the mitigating and aggravating factors. *Id.* (rejecting Laird's contention that the aggravating factor of kidnapping is "weak," as kidnapping is a serious crime, which the record amply showed). Thus, the lack of an additional expert did not prejudice Laird. *Id.* at 997–99.

c.    The Second Habeas Case—District Court Decision and This Appeal

After the state-court proceedings concluded, Laird's federal habeas case was reactivated. In February 2016, Laird filed an amended habeas petition asserting ten claims for relief. Among them was the same mitigation-related ineffective-assistance claim he had raised in his second PCRA petition. In August 2016, the District Court denied the petition in its entirety and denied Laird's request for a certificate of appealability. *Laird v. Wetzel*, 11-cv-1916 (E.D. Pa. Aug. 19,

---

[3] Earlier in its opinion, where analyzing another of Laird's claims, the Pennsylvania Supreme Court reviewed Mark's testimony and determined "the essential points regarding the severity of . . . the sexual abuse . . . all formed part of [his] testimony at the penalty hearing." *Id.* at 992. The Court concluded that anything Mark omitted was covered in the testimony of Dr. Fox and Dr. Dee. *Id.* at 993. The jury found seven mitigating factors relating to this information, including "physical abuse; sexual abuse; emotional abuse; witnessed the abuse of others; psychological consequences of abuse; substance abuse; and alcohol abuse." *Id.*

2016) (Dist. Dkt. 52, 53).

In September 2016, Laird filed a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), which the District Court denied. The District Court concluded that the Pennsylvania Supreme Court had "reasonably" ruled that Laird was not prejudiced by the evidence presented during the penalty phase that described his experience of childhood sexual abuse and its effects. The Court also ruled that trial counsel performed effectively despite not consulting a specialist expert on sexual abuse. In June 2017, Laird filed a notice of appeal.

In March 2020, we partially granted Laird's motion for a certificate of appealability. The sole issue before us is:

> [W]hether counsel was ineffective at the 2007 penalty hearing, in violation of the Sixth Amendment, in failing to present an additional mitigation expert to investigate and diagnose the psychological effects of childhood sexual abuse on male victims and the impact of the sexual abuse inflicted on [Laird] by his own father as it may have related to the murder he committed.

Dkt. 89 at 1–2. We consider only that which appears in the record as relevant to this question.

## II.

Our review of this petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), which substantially limits a federal court's power to grant relief on claims adjudicated on the merits by a state court. *See* 28 U.S.C. § 2254(d). A federal court may only consider habeas petitions where a defendant is being held in state custody "in violation of the Constitution or laws or treaties of the United

22

States." *Id.* § 2254(a). Where a state court has adjudicated the merits of a claim, a federal court cannot grant habeas relief unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(1)–(2); *see also Brown v. Superintendent Green SCI*, 834 F.3d 506, 512 (3d Cir. 2016).

Under § 2254(d)(1), a state court decision is "contrary to" clearly established federal law if the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and reaches an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405, 413 (2000). The petitioner has the burden to "show far more than that the state court's decision was 'merely wrong' or 'even clear error.' The prisoner must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)) (internal citations omitted).

Under § 2254(d)(2), "a state court decision is based on an 'unreasonable determination of the facts' [where] the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding.'" *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 281 (3d Cir. 2016) (en banc) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). This review requires us to analyze "whether there was sufficient evidence to support the state court's factual findings." *Id.* Those findings, implicit and explicit, are subject to AEDPA deference. *See* 28 U.S.C. § 2254(e)(1). They are "presumed to be correct" unless the habeas petitioner rebuts

23

the presumption "by clear and convincing evidence." *Id.*; *see also Lewis v. Horn*, 581 F.3d 92, 111 (3d Cir. 2009).

AEDPA's deferential standard of review applies only to claims adjudicated on the merits in state court. *Cone v. Bell*, 556 U.S. 449, 472 (2009). If a state court decides only part of a federal claim (*e.g.*, only the prejudice component of an ineffective-assistance claim), then only the part ruled on receives AEDPA deference. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam) (applying AEDPA deference to just one element of a court's *Strickland* analysis).

AEDPA's standard is "difficult to meet." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*, 562 U.S. at 102). The high bar "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)). A petitioner can overcome AEDPA's high burden only by showing there was no reasonable basis for the state court's decision. *Id.* at 98. In other words, "a state prisoner must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 572 U.S. 415, 419–20 (2014) (quoting *Richter*, 562 U.S. at 103).

A federal court may not grant habeas relief simply because it "concludes in its independent judgment that the state-court decision applied a Supreme Court case incorrectly." *Blystone v. Horn*, 664 F.3d 397, 417 (3d Cir. 2011). Nor may the court determine the state court's factual determinations are unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt*

*v. Titlow*, 571 U.S. 12, 18 (2013) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). Rather, it "determine[s] what arguments or theories supported or . . . could have supported . . . the state court's decision; and then . . . ask[s] whether it is possible fairminded jurists could disagree" that they are inconsistent with Supreme Court precedent. *Richter*, 562 U.S. at 102. This is "the only question that matters under § 2254(d)(1)." *Id.* (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)).

AEDPA's deferential standard applies "with full force even when reviewing a conviction and sentence imposing the death penalty." *White v. Wheeler*, 577 U.S. 73, 81 (2015).

III.

Laird's ineffective-assistance claim is governed by clearly established federal law that "consists of the rules for determining when a criminal defendant has received inadequate representation as defined in *Strickland*." *Premo v. Moore*, 562 U.S. 115, 121 (2011) (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). Under *Strickland*, a habeas petitioner must show (1) that trial counsel's performance fell below an objective standard of reasonableness and (2) that the performance resulted in prejudice. *Glenn v. Wynder*, 743 F.3d 402, 409 (3d Cir. 2014).

The Supreme Court has instructed that "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Titlow*, 571 U.S. at 22 (quoting *Strickland*, 466 U.S. at 690). There is "[n]o particular set of detailed rules for counsel's conduct [that] can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions." *Pinholster*, 563 U.S. at 195 (quoting *Strickland*, 688 U.S. at 688–89). So, "[s]urmounting *Strickland*'s high bar is never an easy task."

25

*Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

The Pennsylvania ineffective assistance standard is materially identical to *Strickland*. *Commonwealth v. Pierce*, 527 A.2d 973, 976 (Pa. 1987) (holding that *Strickland* and the Commonwealth's leading case address "identical textual and policy considerations," and in fact "constitute the same rule").

Because the standards created by *Strickland* and AEDPA are both highly deferential, review of an ineffective-assistance claim under AEDPA is "doubly" so. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). In the first instance, "the state court was obligated on post-conviction review to view [counsel's] performance deferentially," and then, guided by AEDPA, "we must give wide deference to the state court's conclusions, disturbing them only if the state court unreasonably applied either of the prongs of *Strickland*." *Collins v. Sec'y, Pa. Dep't of Corr.*, 742 F.3d 528, 546–47 (3d Cir. 2014).

## A. Jurisdiction

The District Court had jurisdiction under 28 U.S.C. §§ 2241 and 2254. We have jurisdiction under 28 U.S.C. § 1291. When a district court has not held an evidentiary hearing, as it did not here, we exercise de novo review of its habeas decisions, including its application of AEDPA. *Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009). We review state-court determinations under the same standard that the district court applied. *Blystone*, 664 F.3d at 416–17.

## B. Laird's Claim

Laird argues that his trial counsel were ineffective for unreasonably failing to investigate and present at his 2007 penalty phase compelling mitigating evidence of the sexual abuse that he suffered during childhood as well as the impact

26

of that trauma on his development and on the offense. He argues that defense counsel's presentation of the evidence failed to convey the magnitude of his abuse, thus failing to connect it to the crime. Laird calls the District Court's ruling "manifestly wrong" and an unreasonable application of *Strickland*. Appellant's Br. 17–18. Although the District Court did not adopt the state court's ruling that testimony of Dr. Lisak's report would have been "cumulative" of the trial mitigation evidence, it nevertheless accepted the Pennsylvania Supreme Court's holding that Laird was not prejudiced because at least one juror found a mitigating factor present. Laird argues that Dr. Lisak's testimony would have dramatically upgraded the mitigation evidence in quality and quantity, potentially causing more jurors to have weighed mitigation more favorably. Therefore, he claims, he was prejudiced by the exclusion of the testimony. He requests that we reverse the District Court's judgment and remand with instructions to grant his petition and vacate his death sentence.

In opposition, the Commonwealth argues that defense counsel's performance did not fall below the standard guaranteed to Laird under the Sixth Amendment. It argues that counsel reasonably investigated by consulting multiple mental health experts who, through their testimony, adequately "present[ed] the evidence of Laird's childhood abuse, including sexual abuse, its effect on his life, and the connection between that abuse and Anthony Milano's murder." Appellee's Br. 22. Further, the Commonwealth contends that the state court's analysis is entitled to our deference, as it reasonably interpreted *Strickland* where it determined that Laird was not prejudiced by counsel's performance. Concluding, the Commonwealth recognizes that although further details of Laird's sexual abuse came to light after his retrial, those details were not sufficiently different from the details already

presented to the jury so as to cause the jury to weigh the mitigating and aggravating factors differently. It requests we affirm.

We will begin our review by addressing which state-court decision requires deference under AEDPA. We will then examine the state-court analyses, which we will determine were reasonable. Finally, we will ask whether fair-minded jurists could disagree as to the Courts' ultimate holdings and will answer in the negative.

### 1. Last Reasoned Decision

When applying AEDPA deference to a *Strickland* claim, a federal court reviews the "last reasoned" state-court decision that addressed that claim. *Abdul-Salaam v. Sec'y, Pa. Dep't of Corr.*, 895 F.3d 254, 265 (3d Cir. 2018) (quoting *Bond v. Beard*, 539 F.3d 256, 289 (3d Cir. 2008)). This decision is often the state's highest court's opinion, where the petitioner exhausted their claim. However, in Laird's case, the "last reasoned" decision for each *Strickland* prong, respectively, was made by different courts. *See, e.g.*, *Porter*, 558 U.S. at 39–40 (applying AEDPA deference to the lone *Strickland* prong addressed by the state court); *Abdul-Salaam*, 895 F.3d at 266 (same).

The Pennsylvania Supreme Court denied Laird's additional-expert claim on *Strickland*'s prejudice prong, but it did not address *Strickland*'s performance prong. Therefore, its opinion is the "last reasoned" decision for but half of the *Strickland* analysis. *See Laird*, 119 A.3d at 1012; *see also* Dkt. 116-23, at 207 (notice of appeal). In light of the Court's failure to reach the performance prong, Laird asserted—and the District Court erroneously concluded—that this prong ought to be reviewed de novo. Rather, we must move backward in the case timeline to the PCRA Court's decision, which is the "last

28

reasoned" analysis of the performance prong. The PCRA Court denied Laird's claim on both *Strickland*'s prejudice and performance prongs. Since the performance-prong analysis was not displaced on appeal to the Pennsylvania Supreme Court, it remains intact.

We have previously reviewed different state courts' analyses of *Strickland*'s prongs as the "last reasoned" decisions. In two instances, we were presented with the reverse of this case: we reviewed the PCRA courts' prejudice-prong analyses as the last reasoned decisions because the Pennsylvania Supreme Court only addressed the performance prong. *See Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579, 597 (3d Cir. 2015); *Bond*, 539 F.3d at 289. There is no compelling reason to distinguish Laird's case from those two.

Our responsibility to adhere to AEDPA remains, regardless of the parties' interpretations. The Commonwealth asserts that AEDPA deference applies, but it does not argue that this deference applies to the PCRA Court's performance-prong analysis, nor does it take issue with the District Court's and Laird's application of de novo review to this prong. However, "[e]very court of appeals to consider the question . . . has held a State's lawyers cannot waive or forfeit § 2254(d)'s standard." *Langley v. Prince*, 926 F.3d 145, 162 (5th Cir. 2019) (en banc); *see also id.* at 162 n.8 (collecting cases). Accordingly, we will review the PCRA Court's performance-prong analysis. While we will not reach the prejudice prong, we recognize the Pennsylvania Supreme Court's analysis to be the last reasoned decision on that prong. AEDPA deference applies to both decisions.

## 2. Deficient Performance

To establish the first prong of *Strickland*, deficient performance, a challenger must show that "counsel's

29

representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. There is no specific guideline. "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (internal quotation marks and citations omitted); *accord Strickland*, 466 U.S. at 689 (A court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

In capital cases specifically, counsel must undertake a "thorough investigation of the defendant's background." *Williams*, 529 U.S. at 396. "[C]ounsel's general duty to investigate takes on supreme importance . . . in the context of developing mitigating evidence to present to a . . . jury considering the sentence of death . . . ." *Marshall v. Hendricks*, 307 F.3d 36, 99 (3d Cir. 2002) (quoting *Strickland*, 466 U.S. at 706 (Brennan, J., concurring in part and dissenting in part)). Even so, "strategic choices made after less than complete investigation are reasonable . . . to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (quoting *Strickland*, 466 U.S. at 690–91). As a threshold, "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id.* True, "defense counsel should try to discover all reasonably available mitigating evidence, regardless of whether all of that evidence will ultimately be introduced at trial." *Abdul-Salaam*, 895 F.3d at 269 (internal quotation marks omitted). But "[i]n assessing the reasonableness of [counsel's] investigation . . . a court must consider not only the quantum of evidence already

known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

Though any number of hypothetical experts may have been available for the defense, "[c]ounsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 107. Thus, the question of how much investigation and how many experts were reasonable is, like any other *Strickland* performance inquiry, case- and fact-specific. *Strickland*, 466 U.S. at 688, 690. The selection of an expert witness is an example of counsel's strategic choice that, when made "after thorough investigation of law and facts," is "virtually unchallengeable." *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (quoting *Strickland*, 466 U.S. at 690).

Here, the performance of defense counsel is at issue where they did not retain and present a specialist on childhood sexual abuse—namely, one like Dr. Lisak—in the 2007 retrial penalty phase. Essentially, the PCRA Court determined that Dr. Lisak would have provided no significantly new information or diagnoses that were not presented at the penalty phase. "Certainly," the PCRA Court observed, "doctor after doctor could evaluate [Laird] and likely uncover additional details from [his] past with different theories about how those events in his life impacted him." Dkt. 116-23, at 320. But the PCRA Court faithfully applied *Strickland* in concluding that it was sufficient that "two different experts[,] who conducted multiple interviews [of Laird,] presented opinions that [Laird] suffered from physical, sexual, emotional, and psychological abuse, had diagnoses of brain damage, memory impairment, drug and alcohol dependence, ADHD, and PTSD." *Id.* The testimony of Laird's brother also helped to paint the picture.

*Id.* In sum, the PCRA Court held that, "Trial counsel were not ineffective for failing to present additional details that would have been insignificant considering the evidence as a whole." *Id.*

This was a merits determination of the claim of ineffectiveness related to experts, and thus § 2254(d) governs our review. As we will now explain, this determination was not "contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" in *Strickland* and its progeny. 28 U.S.C. § 2254(d)(1). Furthermore, in the case before us, it is not possible for fairminded jurists to disagree with the PCRA Court's reasoning. *See Richter*, 562 U.S. at 102. As the U.S. Supreme Court has noted, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105. Here, we answer in the affirmative.

Laird contends that the omission of Dr. Lisak's testimony meant that a "critical component" of his mitigation case was not presented. He argues that Dr. Lisak would have testified about two "unrebutted fact[s:] that Laird was repeatedly orally and anally raped by his father over a period of years, and . . . that Laird's murder of a man he perceived as gay was linked to his own experience of brutal and horrific sexual abuse." Appellant's Br. 36–37. But those facts would not have been new. Testimony by Mark, Dr. Dee, and Dr. Fox can only be fairly read as indicating to the jury that sexual abuse was a regular occurrence, just as physical abuse was, and that Laird's life history could have been related to the murder. *See, e.g.*, Dkt. 116-24, at 220–21.

The PCRA Court disagreed with Laird, and its analysis

was reasonable. The Court analyzed counsel's preparation for the retrial; noted that the witnesses who testified during the guilt phase provided information and diagnoses no different from what Dr. Lisak would have said; and concluded that Dr. Lisak's additional testimony "would have been insignificant considering the evidence as a whole." Dkt. 116-23, at 320. The record supports this reasoning because, by the time the trial advanced to the penalty phase, the jury had already heard testimony during the guilt phase that Laird "suffered from physical, sexual, emotional, and psychological abuse, had diagnoses of brain damage, memory impairment, drug and alcohol dependence, ADHD, and PTSD." *Id.*

Laird points to no evidence that suggests either Dr. Dee or Dr. Fox believed they were hampered in their ability to interview and evaluate Laird, which would have potentially required defense counsel to seek an additional expert. Even assuming a younger Laird would have trusted a specialist like Dr. Lisak with further details of his abuse, these details still would not have presented anything new or different—they would have been, as the Pennsylvania Supreme Court concluded, "largely cumulative." *Laird*, 119 A.3d at 997–98.

The PCRA Court recognized defense counsels' presentation of several types of mitigating evidence as a strategic choice they made to counteract and downplay the weight of the two serious aggravating circumstances that were on the table: kidnapping and torture. But Laird argues that Williams's decision to not retain a specialist was not strategic—Williams admitted it did not cross his mind to find a specialist more capable of eliciting further details of the sexual abuse.

Such an argument ignores that Laird was the only source that could provide additional information about his own

33

sexual abuse, and Laird likewise was the only limitation on defense counsel's ability to uncover information. For example, there are no records from any school, medical facility, mental health facility, court proceeding, or police investigation to corroborate or detail Laird's sexual abuse that counsel failed to uncover. Mark was the only witness who corroborated that Laird was sexually abused, and he could only testify as to indicia of abuse, the significance of which he did not understand until he was an adult. Laird himself never testified at the PCRA hearings that followed the retrial, so there was no first-hand support for the notion that he would have revealed more information in 2007, had counsel retained a different type of expert who would have employed different techniques. Laird's claim that he would have been more willing to share details of his abuse with a special expert is merely one-sided speculation. As our sister circuits have recognized, complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified to are largely speculative. *See, e.g.*, *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007); *Wallace v. Lockhart*, 701 F.2d 719, 727–28 (8th Cir. 1983). Crediting this kind of second-guessing would allow hindsight to improperly undermine trial strategy decisions.

Laird's case is distinguishable from the ones cited in his briefing. In those cases, there were gaping holes in the mitigation investigations. For example, *Rompilla v. Beard* requires capital counsel "to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." 545 U.S. 374, 377 (2005). Laird's counsel did just this—they presented a thorough mitigation case, as evidenced by the jury's finding of seven mitigating factors. They not only presented evidence of Laird's good character in

prison but also relied on all relevant records; the testimony of the only living family member who could attempt to corroborate the sexual abuse; and two expert witnesses who testified about Laird's abusive childhood and its impact. Furthermore, counsel argued in closing that the very fact that Laird and his brother only reluctantly discussed their painful history proved the abuse occurred. This was a reasonable trial strategy to counter the suggestion that the sexual abuse had been belatedly fabricated.

Other cases where we have concluded counsel was ineffective concern behavior far below the level exhibited by Laird's trial counsel. Counsel were ineffective in the presentation of mitigation evidence where they performed only a cursory investigation, failing to acquire available records regarding the defendant's background. *Outten v. Kearney*, 464 F.3d 401, 415–18 (3d Cir. 2006). Counsel were ineffective for failing to obtain school and juvenile court records, failing to interview family members with documented mental health issues, and failing to obtain any expert testimony at all regarding the defendant's mental health. *Abdul-Salaam*, 895 F.3d at 268; *Rompilla*, 545 U.S. at 382. We have even found counsel ineffective for failing to timely prepare for the penalty phase. *Jermyn v. Horn*, 266 F.3d 257, 306–08 (3d Cir. 2001) (counsel was ineffective where they had only two years of legal experience, did nothing to investigate and corroborate allegations of abuse through readily-available witnesses and documentary evidence, and did not begin preparation for the penalty phase until the night before). Williams's and Kerrigan's performance is simply not comparable to those cases.

If we were to adopt Laird's argument, we would pervert the *Strickland* standard by impermissibly raising the bar for counsel effectiveness. Holding Williams's performance to be

35

ineffective would essentially ensure that no trial counsel can ever be effective enough, as there may always be other experts who could prompt survivors to reveal more information about their sexual abuse. In fact, our sister circuits have cautioned against the dangers of this very type of hindsight. *See Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir. 1997) (stating that the "mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial").

We will not second-guess the state court's legitimate reasoning. "[W]hen the state court pens a clear, reasoned opinion, federal habeas courts may not speculate as to theories that 'could have supported' the state court's decision." *Dennis*, 834 F.3d at 283. Likewise, "[w]e will not gap-fill when the state court has articulated its own clear reasoning." *Id.* at 284. Here, the PCRA Court articulated its reasoning clearly. We defer to the PCRA Court's review of the performance prong because it faithfully applied *Strickland* to the merits of Laird's claim and reasonably concluded that Williams's decision to not hire an additional expert for the penalty phase was strategic. Considering the totality of the circumstances, viewed "[u]nder the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard," *Knowles*, 556 U.S. at 123, we agree. The PCRA Court's application of *Strickland*'s performance prong was not contrary to, nor an unreasonable application of, federal law articulated by the U.S. Supreme Court.

### 3. Prejudice

Even where counsel's performance was objectively unreasonable, we do not set aside a state-court criminal judgment unless the error had an effect on the trial's outcome.

36

Both prongs of *Strickland* must be met for a petitioner to receive relief for an ineffective-assistance claim. *Workman v. Superintendent Albion SCI*, 915 F.3d 928, 938 (3d Cir. 2019). Logically, prejudice is absent where counsel's performance did not objectively fall short of professional standards. In Laird's case, because the PCRA Court's *Strickland* performance prong analysis was reasonable and is subject to our deference, we need not address the Pennsylvania Supreme Court's ruling on the prejudice prong.

IV.

We are not callous about the anguish caused by a traumatic upbringing like Laird's. Nor do we forget the anguish of Anthony Milano, who unfairly bore the brunt of what can only graciously be considered a gruesome and altogether avoidable manifestation of that trauma. Grave circumstances aside, "the only question that matter[ed]" here, *Lockyer*, 538 U.S. at 71—the only one the law authorizes us to consider—is whether the Pennsylvania courts left a Sixth Amendment violation unaddressed by wrongly applying federal law. They did not, and jurists of reason would not disagree. *See Miller-El*, 537 U.S. at 327; *Strickland*, 466 U.S. at 687.

For these reasons, we will affirm the District Court's denial of the habeas petition.